

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, 7ᵗʰ floor*                                 973-645-2700
*Newark, New Jersey 07102*

November 24, 2020

**<u>Filed Via ECF</u>**
The Honorable Cathy L. Waldor
United States Magistrate Judge
Martin Luther King Jr. Federal Building and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

        Re:   *United States v. Waleed Dozier*
        Crim. No. 20-0724 (BRM)

---

Dear Judge Waldor:

    Defendant Waleed Dozier (hereinafter "Defendant" or "Dozier") seeks temporary release from federal pretrial custody pursuant to 18 U.S.C. § 3142(i) in light of the COVID-19 pandemic.[1]  Dkt. #33.  Defendant complains that the possible spread of COVID-19 at the Essex County Correction Facility ("ECCF"), puts his health at risk during the ongoing pandemic.

    Notably, Defendant does not allege any health conditions which would place his health at greater risk than every single other incarcerated defendant. Moreover, Defendant fails to rebut the presumption that his violent history and pending serious drug distribution and firearms-related felonies do not make him a danger to the community.  Thus, Defendant has fallen well short of meeting the extremely high burden that is required to release a defendant pursuant to § 3142(i), especially one with no health conditions, and who is incarcerated at a facility that has largely contained the spread of COVID-19 within its walls.  The Government respectfully asks the Court to deny Defendant's motion.

## I.    Background

    In August 2019, law enforcement began investigating Dozier for drug trafficking in and around Newark, New Jersey, and his related drug trafficking

---

[1] In an abundance of caution, the Government has also analyzed Defendant's arguments under 18 U.S.C. § 3142(f).

organization (the "DTO"), which included Dozier, Dominique Auston ("D. Auston"), Keevin Auston ("K. Auston"), and others both known and unknown.

As part of this investigation, law enforcement conducted numerous controlled buys into members of the DTO.  For instance, on or about November 19, 2019, law enforcement conducted a controlled purchase during which both Dozier and K. Auston participated in the sale.  Again, on December 4, 2019, law enforcement conducted a controlled purchase during which both Dozier and D. Auston participated in the sale.

During the course of this investigation, law enforcement also placed a GPS tracking device on Dozier's vehicle.  The tracking device revealed that Dozier frequented a house, later determined to be a stash house located on Willoughby Street in Newark, New Jersey (the "Stash House").  On December 19, 2019, law enforcement executed a search warrant at the Stash House and arrested Dozier coming out of the Stash House.  While searching the Stash House, law enforcement recovered the following:

- Three  handguns and assorted ammunition including:
    - one Smith & Wesson M&P 9mm handgun, bearing serial number HRX5456;
    - one Rossi Taurus .357 Magnum handgun, bearing serial number DW298513, loaded with six (6) rounds of ammunition;
    - one Lady Smith Smith & Wesson .357 Magnum handgun, bearing serial number DBJ8858, loaded with five (5) rounds of ammunition; and
    - an additional forty-five (45) .357 caliber rounds of ammunition.
- suspected narcotics, including over 450 grams of a mixture containing heroin and fentanyl[2];
- a mill press which law enforcement believes is used for pressing narcotics using the raw heroin/fentanyl; and
- additional drug packaging paraphernalia, including empty glassine bags, rubber bands, and sandwich bags, among other items commonly used for narcotics packaging and distribution.

While searching Dozier's person, law enforcement also located the key that opened the Stash House, along with an additional twenty bricks of suspected heroin and three cellular devices.

---

[2] Notably, some of the stamps on the heroin/fentanyl recovered from the Stash House matched those bought during controlled purchases from members of the DTO, including Dozier.

Dozier was arrested and charged by Federal Criminal Complaint with possession with the intent to distribute the narcotics and possession of the firearms seized from the Stash House.  *See* Mag No. 19-7571.  Law enforcement continued their investigation, which included executing warrants on Dozier's cellular devices.  From these devices, it became clear that Dozier was the leader in a large-scale drug conspiracy.  Law enforcement recovered numerous narcotics-related text messages between members of the DTO.  For instance, on December 16, 2019, Dozier sent a text message to K. Auston, which stated "Where you at on the count[?]"  K. Auston responded, "Got another 4 ready bro."  Again on December 18, 2019, Dozier checked in with K. Auston stating "what's good bro".  K. Auston responded to Dozier: "Have five working on the six really need some flavor."  D. Auston and Dozier also discuss drugs, including on December 17, 2019 when D. Auston texted Dozier, stating: "I was bouta try 2 get a 40 piece".

Law enforcement then obtained historical cell site records for Dozier, D. Auston and K. Auston's devices which further confirmed that each of them frequented the Stash House during the timeframe of the conspiracy.  Dozier's cellular devices pinged off cell towers in the vicinity of the Stash House nearly 2,000 times between September 1, 2019 and December 19, 2019 (the date of his arrest).

On August 27, 2020, Dozier was indicted in a five-count Indictment charging him with: (1) Conspiracy to distribute over 400 grams of fentanyl; (2) possession with intent to distribute over 400 grams of fentanyl; (3) possession of three firearms (two loaded) and ammunition by a convicted felon; (4) possession of firearms in furtherance of a drug trafficking crime; and (5) maintaining a drug-involved premises.  As noted by Defense Counsel, Dozier consented to detention at his initial appearance.  Dozier faces a fifteen-year mandatory minimum and an advisory guidelines range of 360 months to life imprisonment after trial.[3]

## II.     The Bail Reform Act

As the Court is aware, under the Bail Reform Act, the Court "shall order the pretrial release" of a defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant or "will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  A court's decision whether to release or detain a defendant turns on its determination of whether there is "any condition or combination of conditions set forth in [18 U.S.C. § 3142(c)] that will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the

---

[3] This guidelines range is an estimation calculated by the Government.

community . . . ." 18 U.S.C. § 3142(f). Section 3142(c)(1)(B) of the Bail Reform Act sets forth a nonexclusive list of conditions that a court may impose upon granting a defendant's motion for pretrial release. If after a hearing, the court concludes "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial . . . ." 18 U.S.C. § 3142(e). **Here, there is a rebuttable presumption in favor of detention**. 18 U.S.C. §§ 3142(e)(3)(A) & (B).

In determining whether the defendant poses a threat to the safety of the community, a court must consider several factors, including (1) the "nature and circumstances" of the charged offense, (2) the weight of the evidence against the defendant, and (3) the defendant's history and characteristics, including his character, his family and community ties, his past conduct, his criminal history, and his "record concerning appearance at court proceedings." 18 U.S.C. § 3142(g); *see United States v. Bowers*, 432 F.3d 518, 524 (3d Cir. 2005) (Section 3142(g) lists factors the court must consider when deciding whether to release a defendant).

Separately, § 3142(i) establishes that the Court "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." "[A] defendant's medical condition may present that compelling reason in a particular case." *United States v. Clark*, Crim. No. 19-40068, 2020 WL 1446895, at *6 (D. Kan. Mar. 25, 2020) (citing *United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142(i) for medical reasons)). However, "'[t]he standard imposed by the statute is one of necessity, not convenience.'" *United States v. Aponte-Lebron*, Crim. No. 20-30, 2020 U.S. Dist. LEXIS 53957, at *5 (E.D. Wis. Mar. 25, 2020) (quoting *United States v. Bolze*, Crim. No. 09-93, 2010 WL 199978, at *2 (E.D. Tenn. Jan. 13, 2010)).

This subsection "has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, Crim. No. 19-54 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020). For instance, in *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y 1993), the court permitted release of a defendant under the twenty-four-hour guard of the United States Marshal Service—at his own expense—after he had "sustained a gunshot wound that destroyed his left eye and surrounding area of his face and skull," and after it was determined that "he would 'shortly die' from terminal AIDS," *Clark*, 2020 WL 1446895, at *2 (citing *Scarpa*, 815 F. Supp. at 88). Critically, in *Scarpa*, "correctional authorities could no longer manage his medical needs." *Id.* at *2; *see also United States v. Cordero-Caraballo*, 185 F. Supp. 2d 143, 144-47 (D.P.R. 2002) (ordering release of

defendant who had sustained multiple gunshot wounds, was partially paralyzed, had lost some arm function, had a wound the size of a fist, required four to five contracted security guards to supervise him, and the Bureau of Prisons could not provide the medical care that he required).

In recent months, courts throughout the country have addressed bail motions premised on COVID-19 in the context of both § 3142(f) and § 3142(i). As set forth herein, these cases—as well as the familiar framework of the Bail Reform Act—support denial of the present motion.

## III.   Analysis

### A.   Defendant is Not Entitled to Release Pursuant to 18 U.S.C. § 3142(f)

#### 1.   Defendant is a Threat to the Community

Defendant poses a serious threat to the community. The Defendant incredulously states that "[t]here is no dispute that Mr. Dozier poses absolutely no danger to the community; the Government has presented no facts to the contrary." Def. Br. at 3. This unbelievable assertion has absolutely no basis in law or fact. Critically, the Bail Reform Act's focus on ensuring the safety of the community is not limited to "violence" in the colloquial sense. One Senate Report statement pertaining to the Bail Reform Act declares that "language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence." S. Rep. No. 225 98th Cong., 1st Sess. 6-7, reprinted in 1984 U.S. Code. Cong. & Admin. News 3182, 3195-96; *see also United States v. Millan*, 4 F.3d 1038, 1047 (2d Cir. 1993) ("The language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community"). Against, this backdrop, it is undeniable that Dozier poses a significant danger to the community. As noted in detail above—the Defendant has been charged with five counts of extremely serious firearms and narcotics offenses, which carry a collective mandatory minimum of 15 years' incarceration. Defendant is alleged to be the leader and organizer of a drug trafficking organization that conspired to distribute over 450 grams of fentanyl, a drug that kills tens of thousands of individuals across the County every year.[4] The amount of fentanyl at the Stash House was so great that the FBI had to call in a hazmat team to clear the

---

[4] In 2018, the last year for which the CDC has published statistics on opioid-related deaths, synthetic opioids (over 2/3 of which are fentanyl-related), resulted in nearly 3,000 deaths in New Jersey alone. *See* 2018 Drug Overdose Rates, *Available at* https://www.cdc.gov/drugoverdose/data/statedeaths/drug-overdose-death-2018.html·

premises.  Moreover, the Defendant also had in his possession three loaded firearms in addition to 45 additional rounds of ammunition.  Loaded firearms carry an inherent risk of violence.  But when those firearms are used to protect a large-scale drug supply, the risk of violence is magnified.

Moreover, the evidence against Dozier is overwhelming.  At least three controlled buys were conducted involving Dozier directly.  Dozier was at the Stash House at the time of the search and actually had the key to the door of the Stash House in his pocket.  The phones recovered from Dozier reveal additional evidence to support his narcotics activity—including evidence that others in the DTO actually worked for him, including by packaging narcotics in the Stash House and contributing to the rent.  Cell site data also places him at the Stash House over 2,000 times in just three months.  The GPS tracking device on Dozier's vehicle also confirms that he was at the Stash House nearly every day.  For example, from October 17, 2019 through November 15, 2019, Dozier's vehicle traveled to the Stash House on at least 22 distinct days.  And the search warrant executed on Dozier's home—the home of Ms. Purvis who Defendant proposes as his third party custodian—revealed approximately $40,000 in drug proceeds.

The Defendant's criminal history is also alarming.  From April 1995 until his arrest in this matter, Dozier was arrested 15 times as an adult in New Jersey.  These arrests resulted in two separate convictions for aggravated assault with an attempt to cause serious bodily injury, two separate convictions for resisting arrest, two separate convictions for manufacturing or distributing controlled dangerous substances, one conviction for possession of controlled dangerous substances, and one conviction for distributing controlled dangerous substances on school property.  Most recently, Dozier was sentenced in 2010 to a nine-year term of incarceration for an aggravated assault, including an attempt to cause serious bodily injury.  In that case, Dozier engaged law enforcement in a high-speed chase, culminating in Dozier's vehicle striking and permanently injuring a law enforcement officer.

The defendant's criminal history is certainly abysmal.  But what's more concerning, is the repetitive nature of the Defendant's convictions and the clear lack of respect for the law that permeates all of these convictions.  The Defendant was convicted for his involvement with narcotics twice in 2001, twice in 2003, once in 2004, and again in 2007.  In fact, his only real reprieve from criminal activity in the past 25 years are the times when he was incarcerated.  For instance, the only time since 1995 that Dozier has gone more than two years without an arrest was in 2008 when he was sentenced to a nine-year term of incarceration after committing a violent aggravated assault.

Despite this criminal history replete with violence and drug-related crimes, the Defendant now proposes that he be released into the third-party custody of

- 6 -

his wife, Giovanni Purvis, and that he be placed on home confinement at Ms. Purvis residence, along with his minor son. Notably, on December 19, 2019, the day the Defendant was arrested for the instant offense, he was residing with Ms. Purvis and his son, who were both present in the residence when it was searched pursuant to a warrant. Given the over $40,000 of suspected narcotics proceeds found in the residence, it is likely that Ms. Purvis was aware of her husband's illegal activities. At the very least, her and her son's presence did nothing to deter the Defendant from engaging in the charged and highly serious illegal conduct.

Defendant also poses a risk of flight, as is evidenced by, among other things, his numerous convictions for resisting arrest and fleeing from law enforcement as outlined above. Moreover, Dozier now faces his first federal charges and an extremely lengthy term of incarceration. Consequently, the Defendant has every incentive to flee. His history also shows a complete disrespect for law enforcement, as his 2010 aggravated assault involved allegations that he attempted to run over a law enforcement officer with his vehicle.

In sum, the circumstances of the present offense and Defendant's history and characteristics create a grave risk to society were he to be released. Now, facing a fifteen-year mandatory minimum and an exposure to life imprisonment, the Defendant argues, for the first time, that he poses no threat to society if released. The Defendant has not and cannot rebut the presumption that he remain detained.

**B.      Defendant is Not Entitled to Release Pursuant to Section 3142(i)**

**1.      COVID-19 and the Conditions at ECCF**

The Defendant describes how his exposure to COVID-19 is exacerbated due a generalized assessment of prison conditions. In support of this, the Defendant cites to rates of infection cross the country, and various other statistics country and state-wide. The defendant does not, however, refer to the **current** conditions specifically at the ECCF.[5]

Indeed, ECCF has undertaken sweeping measures and aggressive actions to prevent and mitigate the spread of COVID-19 within the facility. The Government has obtained a sworn affidavit from Alfaro Ortiz, the Director of the

---

[5] As discussed further, Defendant cites to a report from 2018 which addresses the ICE section of ECCF (not where Dozier is housed) and which the report itself acknowledges is "resolved."

ECCF, *see* Govt. Ex. 1,[6] which provides the following (and additional) information about current conditions in the ECCF and the steps being taking to protect the jail population:

- Additional medical staff are on-site and are available to provide medical care 24 hours a day, 7 days a week. The ECCF is equipped with a 42-bed infirmary.

- Since March 2020, the ECCF has developed new protocols for handling inmates who might suffer from conditions making them particularly vulnerable to COVID-19 including daily monitoring of these inmates and plans to remove the inmates from the general population, should the need arise.  Moreover, any inmates who are at a high-risk are currently being housed separately and the corrections officers that work with this population are utilizing full personal-protective equipment ("PPE"), including Tyvek Suits and N-95 masks.

- The ECCF has also increased the monitoring of all inmates for any symptoms of COVID-19.

- The ECCF has hired additional staff to ensure the cleaning and sanitizing of the facility.

- The ECCF has transitioned all visits to non-contact visits that are conducted through physical, glass barriers.

- The ECCF has begun screening all corrections officers and staff for COVID-19, outside of the facility, prior to beginning their shift.  Any symptomatic staff are denied entry into the facility and are sent home.

- All inmates have increased access to soap, which is not shared with other inmates, and have been instructed as to additional measures, such as hand-washing, necessary to stop virus spread.

These measures—which closely track those being taken at BOP institutions[7]—are designed to sharply mitigate the risks of COVID-19 transmission inside the ECCF.  During the pendency of this pandemic, these and additional measures have worked well, as the cases of COVID-19 at the

---

[6] Director Alfaro's affidavit has been updated multiple times throughout the course of the COVID-19 situation to reflect any additional measures that have been undertaken at the ECCF.  This affidavit, the Twenty-Fifth Amended Declaration, is current as of this writing.

[7] *See* COVID-19 Resource Page at https://www.bop.gov/coronavirus/index.jsp (regularly updated).

ECCF have not significantly spread into the overall general population in the facility. As of on or about November 9, 2020, of the approximately 2,046 inmates comprising ECCF's total population (excluding ICE detainees),[8] one county inmate housed at ECCF has currently tested positive for COVID-19. There are an additional five county inmates housed at Delaney Hall (across the street from ECCF) who have tested positive. *See* Ortiz Decl. ¶ 44.

Numerous courts in this district have held that the ECCF is undertaking extraordinary efforts to combat COVID-19. *See, e.g., United States v. Kenneth Roberts*, 20-mj-10033, DKT # 63, at 5 (D.N.J. May 4, 2020) (ESK) (finding that the record "unequivocally shows the extraordinary efforts undertaken by [ECCF] to prevent the spread of COVID-19 infections").

## 2.    Generalized Fear of COVID-19 Does Not Justify Release

First and foremost, courts in this jurisdiction and elsewhere have found, without exception, that a generalized fear of contracting COVID-19 does not, in and of itself, justify release. *See United States v. Miller*, Crim. No. 19-570 (FLW), D.E. 20 (J. Goodman) (D.N.J. Mar. 30, 2020) (denying pretrial release and rejecting arguments concerning generalized "risks associated with COVID-19," particularly where a defendant was "not in a category that presents heightened risks relating to COVID-19, such as being of advanced age or having certain pre-existing health complications."); *United States v. Oberlander*, Crim. No. 16-309 (J. Salas) (D.N.J. Apr. 7, 2020) (denying the defendant's motion for release because COVID-19 is only one factor, and the defendant failed to satisfy the other requirements of the Bail Reform Act); *accord United States v. Jones*, Crim. No. 18-100, 2020 WL 1674145, at *4 (W.D. Pa. Apr. 6, 2020) (denying release on COVID-19 grounds where defendant had pleaded guilty to, among other crimes, an "extremely serious controlled substance" offense and "speculation about present or possible future conditions at the [correctional facility] does not constitute an exceptional reason for release."); *Clark*, 2020 WL 1446895, at *3 (finding that a "defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation.").

Defendant argues for release based on nothing more than a generalized risk that COVID-19 poses to "Dozier if he continues to be detained during this public health crisis." Def. Br. at 6. Defendant does not cite to any data concerning COVID-19 at ECCF and in fact states that "[i]t is only a matter of time before the virus hits the Essex County Correctional Facility – if it has not already – and once it does, the outbreak will spread across the inmate and detainee population." *Id.* This type of conjecture about the risks of COVID-19 at correctional facilities is precisely the type of argument that courts across the

---

[8] The same data provides that no ICE detainees at ECCF have currently tested positive for COVID-19 in the past 23 weeks.

country, including this Court, have consistently rejected.  It is also factually incorrect.  ECCF, like nearly every other prison in the country, has had cases of COVID-19.  However, the precautions discussed above have prevented COVID-19 from spreading across the "inmate and detainee population" as incorrectly predicted by Defendant.  In fact, as of November, 9, 2020 ECCF had 1 COVID-19 case out of approximately 2,046 inmates – or less than one tenth of one percent of the inmate population.

Defendant also cites to a Department of Homeland Security Report, which discusses general concerns regarding food preparation and living conditions at ECCF.  *See* Def. Br. at 10-12.  However, as noted, this report explicitly states that it was conducted for the ICE portion of the facility, which is notably not where Dozier is currently housed.  Conducted prior to COVID-19 and discussing an entirely different building at ECCF, this report is irrelevant to the Court's current consideration.  ECCF is aggressively combatting COVID-19, and it is working.  In light of this, Dozier's speculative concerns do not warrant his release.

### 3. Defendant is Not Among the Categories of Detainees Indicated for Release on COVID-19 Grounds

Importantly, Defendant makes absolutely no argument that he suffers from a present health condition.  Thus, at age 43, Dozier is not elderly and he does not present with health conditions that make him particularly susceptible to COVID-19 complications.  Therefore, Dozier is not among the types of detainees that have been designated for release in light of the pandemic.

Courts in this district and elsewhere have uniformly concluded that they "must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary under § 3142(i)."  *Clark*, 2020 WL 1446895, at *3.  In making that determination, courts have considered various factors, including: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others."  *Id.*  The Government submits that those factors, applied to Defendant, do not warrant temporary release.

First, as detailed extensively above, Dozier is a danger to the community and a risk of flight.  On that basis alone, he should remain detained.  Nonetheless, the remaining factors ***all*** support his continued detention.

Defendant's COVID-19 concerns are about as general as they get; he raises no specific health concerns that are unique to him (as opposed to all ECCF

inmates) and he fails to provide an affidavit regarding any specific conditions at ECCF which subject him to a heightened risk of COVID-19.   Courts have detained Defendants with significant medical conditions.  *See, e.g.*, *United States v. Goettsche*, et al., Crim. No. 19-877 (CCC) (MAH) (D.N.J. Mar. 30, 2020) (denying pretrial release where defendant suffered from asthma, in part, due to evidence of the ECCF's specific protective measures); *United States v. Martin*, Crim. No. 19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (denying release on COVID-19 grounds of a defendant with diabetes, high blood pressure and asthma charged with narcotics conspiracy); *cf. Sacal-Micha v. Longoria*, Civ. No. 20-37, 2020 U.S. Dist. LEXIS 53474, at *5 (S.D. Tex. Mar. 27, 2020) (denying request for release of sixty-nine-year-old immigration detainee with several documented health conditions, noting that he did not allege that he received inadequate care for his current medical conditions).   Dozier's COVID-19 concerns are thus precisely the "generalized fears" that Courts uniformly reject.

Further, Dozier has not provided any reason why he would be safer living with his wife and child in Gloucester County.[9]  In *Clark*, the court denied the defendant's motion for release, in part, because the Court observed:

> Mr. Clark also does not address the extent to which his risks could be exacerbated if he returns to Chicago. He proposes home detention with GPS monitoring. However, he offers no evidence to explain how living with his mother mitigates the risk of infection. For example, he does not explain who else has or will live in or frequent the home or identify any screening practices or concrete COVID-19 precautions being taken there. He therefore offers nothing more than speculation that home detention would be less risky than living in close quarters with others at [the correctional facility], which at least has screening practices and other reasonable COVID-19 precautions in place.

*Clark*, No. 2020 WL 1446895, at *6.

Similarly, Dozier has failed to demonstrate how living with Giovanni Purvis will reduce the risk of infection, as opposed to the measures and protocols that have been implemented at ECCF, as set forth above.  *See United State v. Green*, 2020 U.S. Dist. LEXIS 53440 (W.D. Pa. Mar. 27, 2020) (denying Green's motion for pretrial release despite his asthmatic condition, noting that his potential for exposure "exist[ed] anywhere in the community").   Moreover, if released, Defendant certainly poses a risk of infecting the community at large, including his wife and son.

---

[9] There have been approximately 293,744 cases of COVID-19 in New Jersey, including at least 7,500 in Gloucester County where the Defendant proposes to reside.   *See* https://covid19.nj.gov/#live-updates.

The Government respectfully submits that, for all of the reasons set forth above, this Court should find that an individualized assessment here supports the Defendant's continued detention.  The government acknowledges that there are pretrial detainees in the federal system and elsewhere who have contracted COVID-19.  Unfortunately, there will be others. But that inevitability does not justify wholesale release, which would be the logical conclusion of Defendant's proposal.  The decision of whether or not Defendant should be released should not turn solely or even primarily on the fact that he may eventually contract COVID-19.  Rather, the courts must undertake an individualized assessment guided by the factors and standards articulated in § 3142.  The Government submits that Defendant should continue to be detained.  *See United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *1-2 (Mar. 20, 2020 E.D.N.Y.) (denying motion for release where defendant failed to rebut presumption that he was a flight risk and a danger to the community, and finding possibility of COVID-19 outbreak did not provide sufficiently compelling justification for release despite defendant's advanced age, dementia, and prior heart conditions).

### 4. The Current Conditions Will Not Have a More Serious Impact on the Defendants' Access to Counsel Than on Those of Similarly Situated Defendants

Defendant also argues that his continued detention during the COVID-19 pandemic interferes with his ability to prepare his defense.  Def. Br. at 13-16. Defendant argues this largely based on a "tremendous volume of discovery" that he will have difficulty reviewing while incarcerated, as well as a reduction in attorney visitation at ECCF stemming from the pandemic.  *Id.* at 14.  This argument should be rejected as the Defendant has not demonstrated that the current conditions at ECCF will have a more serious impact on the Defendant's Sixth Amendment rights than on those of similarly situated detainees.

First, as to the "tremendous volume of discovery" that Defendant alleges exists in this matter.  The Government agreed with all three defense counsel in this matter that this is not a complex case, and therefore is one that "does not require extensive discovery".  *See* DKT #32.  Moreover, the Government produced the entirety of the discovery in this matter by October 26, 2020, less than one month after the entry of a scheduling order.  And, the Government was able to produce all of the discovery via USAFX, an online platform that is not able to be used when the volume is discovery is too great (in those cases, a hard drive would be necessary).  Thus, the discovery in this case is certainly not out of the ordinary, or so large as to justify Dozier's release on that basis alone.

Courts consistently find that a pretrial detainee's right to counsel is infringed only when prison regulations unreasonably burden or significantly interfere with the detainee's access to counsel.  *United States v. Dawara*, No. 19-CR-414-1, 2020 WL 2404898, at *8 (E.D. Pa. May 12, 2020 (citing *Benjamin v.*

*Fraser*, 264 F.3d 175, 187 (2d Cir. 2001)).  To be sure, the COVID-19 pandemic has forced prisons around the country to take significant steps to protect their populations, and ECCF is no different.  As part of those efforts, ECCF has restricted in-person visits by attorneys and other visitors and limited the movement of detainees around the facility.  Yet despite these reasonable restrictions, defendants are still provided ample opportunities to interact with counsel, including by mail, over the phone, and through videoconferences.  *See* Ex. 1, Ortiz Decl. ¶¶ 19(n); 20(c); 20(g); 20(k); 20(l) ("Advocates can initiate calls to inmates or detainees on a confidential line for up to 99 minutes.").

Indeed, other courts have rejected similar arguments.  For example, the Chief District Judge in the Eastern District of Pennsylvania rejected a defendant's claims that FDC Philadelphia's restrictions on his access to counsel required release under § 3142(i) and the Sixth Amendment.  *See Dawara*, 2020 WL 2404898, at *8.  Although the Court acknowledged limitations on the defendant's ability to meet with his attorney, it held that "[c]onsidering the measures necessary for the BOP to prevent spread of COVID-19 in its institutions, the suspension of legal visits could hardly be viewed as unreasonable." *Id.* at *8; *see also United States v. Corbitt*, No. 20-CR-00030, 2020 WL 2098271, at *8 (M.D. Pa. May 1, 2020) (rejecting motion for release under Section 3142(i) and noting that "[i]f federal courts had to order temporary release just because it would aid a defendant's ability to work with counsel, the exception in section 3142(i) would swallow all detention orders") (quotation omitted); *United States v. Olszewski*, No. 15-Cr-364, 2020 WL 2420483, at *3 (S.D.N.Y. May 12, 2020) (despite defendant's argument that he was "unable to meet with his attorney in person and is only able to speak with her by phone in a limited capacity," holding that BOP's limitations "do not constitute an 'extraordinary and compelling reason' making compassionate release appropriate"); *United States v. Landji*, No. 18-CR-601 (PGG), 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) ("Although the Court is concerned about [defendant's] access to counsel, it cannot find that BOP's decision to suspend all legal visits for 30 days is unreasonable in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large").

There is also less of an immediate need for extensive consultation, at least compared to other cases with more urgent deadlines.  As a district court judge in the Central District of California ruled in denying release on COVID-19 grounds, "the fact of the matter is that no jury trial will be conducted until conditions in the Central District normalize.  Notwithstanding any current limitations on attorney visits, there will be an adequate opportunity to prepare once conditions normalize." *United States v. Avenatti*, Crim. No. 19-61 (JVS), at 2-3 (C.D. Cal. Mar. 21, 2020).

Here, there is no scheduled trial date, and there are no evidentiary hearings scheduled at this time.  Moreover, there is no indication that

Defendant's release would improve his ability to meet and confer with defense counsel.  In light of current social distancing measures, even if Dozier were to be temporarily released, he would still communicate with defense counsel in the same manner as he is capable of doing from ECCF—namely, over the phone and via video conference.

In sum, Defendant has not shown that ECCF's restrictions are unreasonable or that they violate his right to counsel.  Simply put, Dozier is a dangerous individual—one who poses a risk of flight—and he should therefore be detained pending trial.

## IV.   Conclusion

For the reasons set forth above, the Government respectfully submits that Defendant is a danger to the community and cannot overcome the presumption of detention in 18 U.S.C. § 3142(f) or the high standard of 18 U.S.C. § 3142(i). The Defendant's motion should be denied.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

By:     Emma Spiro
        Assistant U.S. Attorney